IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| ROMI BOTEZ,<br><br>    Plaintiff,<br> v.<br><br>NORTHSTAR CG, LP,<br><br>    Defendant. | Case No.: 3:24-cv-00064-AN<br><br>OPINION AND ORDER |

    This is a contract and wage dispute between plaintiff Romi Botez ("plaintiff") and his former employer, defendant NorthStar CG, LP ("defendant" or "NorthStar"). Plaintiff alleges that defendant breached its employment agreement with plaintiff by failing to pay out plaintiff's earned bonuses after his termination. Defendant seeks partial summary judgment, arguing that there is no genuine issue of material fact as to plaintiff's claims for breach of contract, wage penalties, and breach of the duty of good faith and fair dealing. After reviewing the parties' filings, the Court finds that oral argument will not help resolve this matter. Local R. 7-1(d). For the reasons stated below, defendant's motion for partial summary judgment is DENIED.

**LEGAL STANDARD**

    Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When deciding a motion for summary judgment, the court construes the evidence in the light most favorable to the non-moving party. *See Barlow v. Ground*, 943 F.2d 1132, 1135 (9th Cir. 1991). However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986) (emphases omitted). The substantive law determines which facts are material. *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the

1

governing law will properly preclude the entry of summary judgment." *Id.* A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The moving party has the initial burden of informing the court of the basis for its motion and identifying the portions of the pleadings and the record that it believes demonstrate the absence of an issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party need not produce evidence negating or disproving every essential element of the non-moving party's case. *Id.* at 325. Instead, the moving party need only show "that there is an absence of evidence to support the non[-]moving party's case." *Id.* If the moving party sustains its burden, the non-moving party must then show that there is a genuine issue of material fact that must be resolved at trial. *Id.* at 324.

## BACKGROUND

A.   **Factual Background**

Defendant is a demolition company with locations in the Pacific Northwest and affiliate entities across the country. Decl. of Diana Thomson Supp. Def. Mot. for Partial Summ. J. (Thomson Decl."), ECF [11], ¶ 2. In April 2016, plaintiff was hired as a Project Manager for defendant's Pacific Northwest branch, where he reported to the Vice President of Operation for the Pacific Northwest, Diana Thomson ("Thomson"). Decl. of Mark Crabtree Supp. Def. Mot. for Partial Summ. J. ("Crabtree Decl."), ECF [9], Ex. 1, at 2-3 (references to pagination of exhibit). As a project manager, plaintiff was responsible for ensuring the profitable and safe performance of all projects under his direction. *Id.* at Ex. 1, at 22; Decl. of Ashley A. Marton Supp. Pl. Resp. Opp'n Def. Mot. for Partial Summ. J. ("Marton Decl."), ECF [16], Ex. 1.

Several documents controlled the terms of plaintiff's employment. First, plaintiff signed an Employment Offer Letter, dated April 19, 2016 (the "2016 Offer Letter"). Crabtree Decl. Ex. 1, at 22-25; Marton Decl. Ex.1. Second, he subsequently signed a second Employment Offer Letter, dated July 25, 2022 (together, the "Offer Letters"). Crabtree Decl. Ex. 1, at 33-35; Marton Decl. Ex. 11. The material

2

terms at issue in this action are substantively identical across the two letters. Finally, plaintiff signed a Bonus-Incentive Programs document (the "Bonus Agreement," and together with the Offer Letters the "Employment Agreements") on March 29, 2019. Crabtree Decl. Ex. 1, at 26-31; Marton Decl. Ex. 6.

Two provisions in the Offer Letters are pertinent to the parties' dispute:

"INCENTIVES: Methods of performing work more efficiently and productively are the foundation of NorthStar's profitability. ***NorthStar has established Bonus-Incentive programs to provide additional Incentives to its personnel in recognition of their significant achievements. You shall participate in the NorthStar Bonus Incentive Programs***, effective January 01, 2016, as amended.

. . . .

"EMPLOYMENT TERMS: You acknowledge and agree that your employment is 'at will'. Nothing herein is intended by [NorthStar] or you to create an employment relationship beyond an employment at will. Both of us shall retain the right at any time without cause to terminate your employment with [NorthStar]. ***Should you resign or your employment terminated 'for cause' all unpaid incentive bonus shall be forfeited by you***."

Crabtree Decl. Ex. 1, at 23-24 (emphases added); Marton Decl. Ex.1 (emphases added).

The "NorthStar Bonus Incentive Programs" referenced in the Offer Letters are described in greater detail in the Bonus Agreement. Of the four programs included in the Bonus Agreement, this case concerns only the Performance Safety Incentive ("PSI") Plan. *See* Crabtree Decl. Ex. 1, at 29-30; Marton Decl. Ex. 6, at 3-4. The PSI Plan provides, in relevant part:

"a. ***To qualify for a bonus, a project or project phase must produce a minimum required gross profit*** as defined . . . below, (1) with no lost time injuries, and (2) no regulatory violations, and (3) no OSHA recordables for projects up to $5,000,000 in revenue or (b) one OSHA recordable for projects with more than $5,000,000 in revenue. Any request for exceptions requires approval of the COO of NorthStar Group Services, Inc., whose decision shall be final and binding.

. . . .

"c. ***Projects of any Project Manager and/or Supervisor incurring cumulative accident costs exceeding $100,000.00 or regulatory penalties . . . may exclude the Project Manager and/or Supervisor from the bonus program for one year*** and subject him/her to disciplinary action, up to and including termination of employment. . . .

"d. ***The Branch Manager,*** subject to the approval of the COO for each specific bonus award, ***has the discretion to award up to five (5%) percent of the project or project phase gross profit to be divided among the Supervisor, Project Manager, Estimator and such other Branch personnel*** who, in the opinion of the Branch Manager, made a direct contribution to the gross profit performance and safety of the project. In addition, the

3

>overall performance of the Branch as compared to the calendar year plan will be a factor in considering and evaluating the percentage to award. ***The allocation of amounts*** to be awarded within the confines of five (5%) percent of the gross profit ***shall be determined at the Branch Manager's discretion based upon his/her determination of contribution to the project success***, subject to the other terms of this program.
>
>"e. Bonus awards will only be paid on 100% completed projects or project phases after all costs are charged to the project or project phase and all of the revenue for the project or project phase have been collected."

Crabtree Decl. Ex. 1, at 29-30 (emphases added); Marton Decl. Ex. 6, at 3-4 (emphases added). Plaintiff received numerous PSI bonuses throughout his employment, which he recorded in tables organized by project. *See* Marton Decl. Ex. 2, at 8, & Ex. 9. When plaintiff's employment began, these bonuses were paid quarterly. *Id.* at Ex. 2, at 9-10. In the last few years of plaintiff's employment, they were paid biannually instead. *Id.* According to Thomson, "[o]ne purpose of the PSI bonus plan is to motivate current employees to continue meeting safety and profit goals." Thomson Decl. ¶ 5.

In 2018, after working at the company for about two years, plaintiff was promoted to Senior Project Manager. Marton Decl. Ex. 2, at 4. In 2019, Thomson reported that plaintiff was the strongest project manager in the region and awarded him a $10,000.00 salary increase. *Id.* at Ex. 4; *see id.* at Ex. 2, at 2-3. Plaintiff also received over $25,000 in PSI bonus payments that year. *Id.* at Ex. 2, at 11-12, *see id.* at Ex. 9 (showing plaintiff's spreadsheets of earned PSI bonus payments). In 2020, plaintiff received more than $26,000 in PSI bonus payments. *Id.* at Ex. 2, at 11-12. Plaintiff was promoted again in 2021, this time to General Manager of the Milwaukie Branch. *Id.* at Ex. 2, at 4. As General Manager, plaintiff managed around a dozen employees, a warehouse, and daily operations. *Id.* at Ex. 2, at 7. Plaintiff's PSI bonus payments in 2021 exceeded $37,000. *Id.* at Ex. 2, at 11-12.

In March 2022, while working as a General Manager, plaintiff also worked as the Senior Project Manager for two projects: the PDX T-Core project ("PDX T-Core Project"), which was worth $35 million; and the Port of Portland Abatement contract ("Port of Portland Abatement Project"), which was worth $2 million (together, the "Portland Projects"). Marton Decl. Ex. 5, at 2.

In July 2022, plaintiff requested a transfer to one of defendant's Florida affiliates, NorthStar I&E, Inc. ("NorthStar I&E). *See id.* at Ex. 2, at 3 & Ex. 11, at 1. He began his work for NorthStar I&E on

4

September 1, 2022. *See id.* at Ex. 11, at 1. However, on November 3, 2022, plaintiff informed the Vice President of Administration, Kamal Sookram ("Sookram"), that he needed to take medical leave while awaiting a hip replacement. *See* Crabtree Decl. Ex. 1 at 37. *Id.* at Ex. 7. Plaintiff submitted a short-term disability request on November 15, 2022. *Id.* at 44.

On November 30, 2022, defendant's parent company, NorthStar Group Services, Inc. ("NorthStar Group Services"), notified plaintiff of his rights under the Family and Medical Leave Act ("FMLA") and placed him on FMLA-covered leave. *Id.* at 48-49. Plaintiff learned in February 2023 that his twelve weeks of FMLA-covered leave had expired. *Id.* at Ex. 1, at 18-19, 48. After the FMLA-covered leave expired, NorthStar Group Services placed plaintiff on a medical leave but continued paying his insurance premiums. *See id.* at Ex. 1, at 19. In April 2023, plaintiff submitted a long-term disability claim. *Id.* at Ex. 1, at 20. Defendant was advised that these benefits were approved through April 2025. Decl. of Sookram Decl., ECF [10], ¶ 2 & Ex. 1.

The PDX T-Core Project was completed and paid in full by March 2023. Marton Decl. Ex. 3, at 7-8. On March 6, 2023, plaintiff texted Thomson asking if she "ha[d] anything on PSI" bonuses for the Port of Portland Abatement Project. *Id.* at Ex. 7, at 1. She responded, in relevant part: "I see commissions just coming through. Not seen PSI yet. Should be soon[.]" *Id.* Plaintiff followed up on March 28, 2023, asking if the PSI bonuses would be paid that Friday. *Id.* Thomson wrote back: "No. I got the list last week. Worked on it today. Not final yet but will be and then I submit. So no for this Friday. Also [the Port of Portland Abatement Project] was not paid in full and still isn't." *Id.* On April 11, 2023, Thomson confirmed that the Port of Portland Abatement Project had been paid off as well. *Id.* at Ex. 7, at 2. On May 10, 2023, plaintiff wrote, in relevant part: "Hoping to get some clarity on PSI payout for the [Port of Portland] [A]batement [P]roject. I heard something about September and wanted to double check, as that timeline doesn't seem right?" *Id.* Thomson responded, in relevant part, that the "[Port of Portland Abatement Project] was paid in full in February or March. It should be on the next round around September. I'm not given the exact date." *Id.*

One week later, on May 18, 2023, defendant terminated plaintiff's employment. Sookram

5

Decl. ¶ 4. A letter from Sookram provided that, "you have been out on disability as of October 10, 202[2] and have exhausted your FMLA Section, therefore we cannot hold your position available for you at this time." Sookram Decl. Ex. 2. It also provided that the health benefit coverage would terminate on May 30, 2023. *Id.*

In November 2023, Thomson allocated PSI bonuses ranging from $1,000 to $30,000 to employees who worked on the PDX T-Core Project. Thomson Decl., ECF [11], ¶ 3. In May 2024, Thomson also awarded PSI bonuses to employees who worked on the Port of Portland Abatement Project. *Id.* ¶ 4. Thomson did not award plaintiff any PSI bonuses associated with either of the Portland Projects "because he was no longer employed with NorthStar at the time of the PSI awards." *Id.* ¶ 5. Thomson states that she has never awarded a PSI bonus to a former employee. *Id.*

**B.      Procedural Background**

On November 22, 2023, plaintiff filed this action in Clackamas County Circuit Court. Notice of Removal, ECF [1], ¶ 1. Plaintiff asserts (1) a wage claim, pursuant to Oregon Revised Statutes ("ORS") § 652.140 *et seq.*; (2) a breach of contract claim; (3) a claim for breach of the covenant of good faith and fair dealing; and (4) a claim for retaliation under ORS § 652.355. Defendant removed the case to federal court on January 10, 2024, and then answered the complaint on January 16, 2024, ECF [3]. On October 30, 2024, defendant moved for partial summary judgment. Def. Mot. for Partial Summ. J. ("Def. Mot."), ECF [8]. Specifically, defendant seeks summary judgment as to plaintiff's wage claim, breach of contract claim, and claim for breach of the duty of good faith and fair dealing. *Id.* at 2.

## DISCUSSION

At heart, this is a breach of contract dispute. Defendant argues that the Employment Agreements provide the company full discretion in awarding (or not awarding) PSI bonuses. Def. Mot. 7-8. Accordingly, defendant argues that plaintiff was not contractually entitled to receive a bonus, and the company's decision not to pay plaintiff any bonuses after termination cannot constitute a breach of contract. *Id.* at 8-9. Plaintiff argues that he earned his PSI bonuses associated with the Portland Projects while employed and that the bonuses were not conditioned on his continued employment. Pl. Resp. Opp'n Def.

6

Mot. for Partial Summary J. ("Pl. Resp."), ECF [15], at 9-10.

**A.     Breach of Contract**

There remains a genuine question of material fact as to whether plaintiff is entitled to a PSI bonus under the Employment Agreements. The ultimate question that defendant's motion raises is whether the Employment Agreements give defendant full discretion to award or withhold PSI bonuses as it sees fit. That is a matter of contract interpretation and, as described below, not appropriate for decision on summary judgment.

Oregon courts use a three-step process to answer questions of contract interpretation.[1] *Yogman v. Parrott*, 325 Or. 358, 361, 937 P.2d 1019 (1997) (quoting *Eagle Indus., Inc. v. Thompson*, 321 Or. 398, 405, 900 P.2d 475 (1995) (en banc)). First, the court determines, as a matter of law, whether the applicable contract term is ambiguous. *Id.* "The threshold to show ambiguity is not high." *Adair Homes, Inc. v. Dunn Carney Allen Higgins & Tongue, LLP*, 262 Or. App. 273, 277, 325 P.3d 49 (2014). "A contract term is ambiguous if, when examined in the context of the contract as a whole and the circumstances of contract formation, it is susceptible to more than one plausible interpretation." *Id.* Thus, to determine whether a contract provision is ambiguous, courts look to the plain meaning of the words used and the circumstances underlying the contract's formation. *See id.* at 277, 281; *Batzer Constr., Inc. v. Boyer*, 204 Or. App. 309, 317, 129 P.3d 773 (2006). If possible, courts must "construe the contract so as to give effect to all of its provisions." *Williams v. RJ Reynolds Tobacco Co.*, 351 Or. 368, 379, 271 P.3d 103 (2011). "If a contract's provisions are internally inconsistent regarding a subject, then the contract is ambiguous

---

[1] Both parties cite to Oregon case law and thus appear to agree that this dispute is governed by Oregon law. *See* Def. Mot. 7 (citing *Groshong v. Mutual Enumclaw Ins. Co.*, 329 Or. 303, 308, 985 P.2d 1284 (1999)); Plf. Resp. 8 (citing *Wyss v. Inskeep*, 73 Or. App. 661, 666, 699 P.2d 1161 (1985)). "When sitting in diversity, [federal courts] apply the choice-of-law rules of the forum state." *Coneff v. AT & T Corp.*, 673 F.3d 1155, 1161 (9th Cir.2012). In the absence of a choice of law provision, Oregon law directs courts "to determine the most appropriate law to apply by considering which state has the most relevant connection to the transaction or the parties." *Portfolio Recovery Assocs., LLC v. Sanders*, 292 Or. App. 463, 470, 425 P.3d 455, 460 (2018), *aff'd*, 366 Or. 355, 462 P.3d 263 (2020) (citing Or. Rev. Stat. § 15.360). Here, the 2016 Offer Letter, which governed the vast majority of plaintiff's work, stated that plaintiff was being hired for the "Milwaukee, OR Office." Crabtree Decl. Ex. 1, at 25; Marton Decl., Ex. 1, at 1. Oregon has an interest in having its laws applied to employees working within the state. *See Portfolio Recovery Assocs.*, 292 Or. App. at 470 (explaining that courts look to the interest of the states at issue in evaluating relevant connections). Accordingly, this dispute is appropriately governed by Oregon law.

regarding that subject." *Adair*, 262 Or. App. at 278. If the disputed contract term is unambiguous, the inquiry ends, and the dispute is resolved as a matter of law. *Eagle Indus., Inc.*, 321 Or. at 405.

If the term is ambiguous, the court moves to the second step in the *Yogman* analysis and looks to extrinsic evidence of the parties' intent. *Yogman*, 325 Or. at 363. Oregon follows an objective theory of contracts, so evidence at this stage may include expressions of intent made at the time of formation. *Apeldyn Corp. v. Eidos, LLC*, 943 F. Supp. 2d 1145, 1149 (D. Or. 2013) (citing *Holdner v. Holdner*, 176 Or. App. 111, 29 P.3d 1199 (2001)). In the absence of direct evidence, courts look to "the parties' course of dealing or their performance performance during the contract[.]" *Id.* (citing *Yogman*, 325 Or. at 364; *Goodman v. Cont'l Cas. Co.*, 141 Or. App. 379, 918 P.2d 438 (1996)). If ambiguity still remains after examining evidence of the parties' intent, courts turn to step three and apply any relevant maxims of construction. *Yogman*, 325 Or. at 364. Steps two and three of the *Yogman* analysis are rarely appropriate for summary judgment. *See Madson v. W. Or. Conference Ass'n of Seventh-Day Adventists*, 209 Or. App. 380, 384, 149 P.3d 217 (2006) ("Generally, when the terms of a contract are ambiguous, summary judgment regarding their meaning is not appropriate."). Therefore, "[i]f a contract is ambiguous, and there is relevant competing extrinsic evidence to resolve the ambiguity, ascertaining the meaning of the contract involves a question of fact and the dispute over the contract's meaning cannot be resolved on summary judgment." *Adair*, 262 Or. App. at 278.

1. *Contract Validity*

As a preliminary matter, the Bonus Agreement is a valid contract. Defendant claims that "[t]he PSI plan is not a contract, except to the extent NorthStar is obliged to consider awarding discretionary bonuses on qualifying jobs." Def. Mot. 10. Nothing in the Bonus Agreement suggests that it is anything but a valid and enforceable contract. First, the Bonus-Incentive Programs described in the Bonus Agreement are expressly referenced in the Offer Letters. *See* Crabtree Decl. Ex. 1, at 23, 34; Marton Decl. Exs. 1 & 11. Like the Offer Letters, the Bonus Agreement is signed and dated. *See* Crabtree Decl. Ex. 1, at 31; Marton Decl. Ex. 6, at 6. Defendant does not cite any authority explaining why the Bonus Agreement should not qualify as a valid contract. Indeed, Oregon courts routinely find that employment bonus plans

are valid, enforceable contracts. *See, e.g.*, *Wyss v. Inskeep*, 73 Or. App. 661, 667, 699 P.2d 1161 (1985) (citing *Yartzoff v. Democrat Herald Publ'g Co.*, 281 Or. 651, 656-57, 576 P.2d 345 (1978)) (finding a bonus plan became part of the employment contracts); *Walker v. Am. Optical Corp.*, 265 Or. 327, 330, 509 P.2d 439 (1973) ("[T]he bonus plan offered by the employer normally becomes binding as a unilateral contract when the employee begins performance of the terms of the proposed plan, in the sense that the plan cannot then be revoked by the employer."). The Bonus Agreement is a valid contract.

2. *Ambiguity*

The Bonus Agreement is ambiguous as to how much discretion defendant may exercise over the PSI bonuses. The parties' dispute centers primarily around one provision of the Bonus Agreement. That provision dictates how PSI bonuses are assessed and states:

> "The Branch Manager, subject to the approval of the COO for each specific bonus award, ***has the discretion to award up to five (5%) percent of the project*** or project phase gross profit ***to be divided among the Supervisor, Project Manager, Estimator*** and such other Branch personnel who, in the opinion of the Branch Manager, made a direct contribution to the gross profit performance and safety of the project. In addition, the overall performance of the Branch as compared to the calendar year plan will be a factor in considering and evaluating the percentage to award. ***The allocation of amounts to be awarded within the confines of five (5%) percent of the gross profit shall be determined at the Branch Manager's discretion*** based upon his/her determination of contribution to the project success, subject to the other terms of this program."

Crabtree Decl. Ex. 1, at 30; Marton Decl. Ex. 6, at 5 (emphases added). Another informative provision provides how projects may qualify for a PSI Bonus: "To qualify for a bonus, a project or project phase must produce a minimum required gross profit . . . (1) with no lost time injuries, and (2) no regulatory violations, and (3) no OSHA recordables . . ." *Id.* Taken together, it is clear defendant has discretion in determining PSI bonus amounts associated with completed projects. The question is the extent of that discretion.

One interpretation, which defendant advances, is that the company has complete discretion over the who, what, when, and why. *See* Def. Mot. 7. According to defendant, its only obligation is to consider employees for bonus awards. *See id.* The qualification criteria, per defendant, merely describe how a project can qualify for bonus *consideration*, it does not set the criteria to determine when a bonus must be awarded. *See* Def. Mot. 7. That is not an unreasonable reading. As noted, the Bonus Agreement

9

provides that the "Branch Manager . . . has the discretion to award up to five (5%) percent of the project" and that "[t]he allocation of amounts to be awarded within the confines of five (5%) percent . . . shall be determined at the Branch Manager's discretion." Crabtree Decl. Ex. 1, at 30. One could reasonably read those sentences to mean that defendant has complete discretion in deciding whether to award a bonus for a given project and, if awarded, how to divvy up the award among eligible employees.

However, that is not the only reasonable reading of the Bonus Agreement. Another reasonable interpretation is that defendant has discretion in deciding whether to award a bonus associated with a given project, but it does not have discretion in deciding to withhold an awarded bonus from certain eligible employees. The Agreement expressly provides that the bonus is "to be divided among the Supervisor, Project Manager, Estimator and such other Branch personnel" that the Branch Manager finds eligible. *Id.* That phrasing could reasonably be read to mean that once defendant decides to award a PSI bonus for a given project, it must award the bonus at least to the Supervisor, Project Manager, and Estimator involved.

Alternately, the Bonus Agreement could also be read to mean that defendant has discretion over whether to award the bonus and who the recipients of the bonus will be, but that defendant's allocation decisions must be based upon each eligible employee's "contribution to the project success, subject to the other terms of the program." *Id.* In other words, defendant would have discretion to decide *whether* to award a bonus and *how* to allocate it, but that allocation decision must be based on employee contribution and the Bonus Agreement's other terms. One of those other terms, for example, explains that project managers may be excluded from the bonus program when their projects incur accident costs or regulatory penalties above a certain threshold. *Id.* Continued employment is not mentioned.

The Bonus Agreement is therefore ambiguous as to the extent of defendant's discretion. None of the terms clearly provide for defendant's full discretion, and the existence of *some* discretion does not defeat the Bonus Agreement's contractual force. *See Wyss*, 73 Or. App. at 666-67 (rejecting argument that a company's discretion over a bonus plan renders the plan's promises illusory). Accordingly, the Court turns to the second step of the *Yogman* analysis and looks to evidence of the parties' intent upon contract

formation.

    3.    *Intent*

The parties have put forth relevant competing evidence as to their intent. Neither party provides direct evidence of the stated intent upon contract formation, and it appears that the only direct evidence is the statement in the 2016 Offer Letter that "NorthStar has established Bonus-Incentive programs to provide additional Incentives to its personnel in recognition of their significant achievements." Crabtree Decl. Ex. 1, at 23; Marton Decl. Ex. 1. That statement does not provide insight as to whether the parties intended for defendant to have complete discretion as to the PSI bonuses.

Without direct evidence, the Court looks to the parties' performance. *See Apeldyn*, 943 F. Supp. 2d at 1149. Defendant presents little evidence on this point, instead primarily relying on Thomson's statements that she "exercised [her] discretion to award bonuses" as to the Portland Projects and that the "purpose of the PSI bonus plan is to motivate current employees to continue meeting safety and profit goals." Thomson Decl. ¶¶ 3-5. Plaintiff provides a little more. First, he offers deposition testimony from Thomson stating that she has never "not given a PSI [bonus] when . . . all the criteria was met." Marton Decl. Ex. 3, at 5. Second, plaintiff offers charts showing the PSI bonuses he received from past projects, *id.* at Ex. 9, and defendant does not appear to dispute these values. Finally, plaintiff offers Thomson's description of how she awards PSI bonuses. *See id.* at Ex. 3, at 4. Thomson testified at deposition that after receiving a list of projects from the regional controller, Thomson's controller analyzes the "total jobs on a percentage of time spent on the project." *Id.* Thomson then reviews that list with her managers or general superintendent, and "distribute[s the bonuses] off of a certain percentage based on the statement of what someone does to contribute . . . to the profitability of the job." *Id.* Based on this competing extrinsic evidence, "ascertaining the meaning of the contract involves a question of fact" that cannot be resolved on summary judgment. *Adair*, 262 Or. App. at 278.

    4.    *Plaintiff's Termination*

While this case is primarily a matter of contract interpretation, the parties also focus their briefing on the impact of plaintiff's termination. Nothing in the Employment Agreements suggests that

plaintiff forfeits his bonuses upon termination. By contrast, the Offer Letters explain that "all unpaid incentive bonuses shall be forfeited" if plaintiff resigns or is terminated for cause. Crabtree Decl. Ex. 1, at 24; Marton Decl. Ex. 1, at 3. Neither party argues that plaintiff resigned or was terminated for cause. As such, the plain text of the Employment Agreements does not preclude plaintiff from receiving a bonus payment upon or after termination.

Case law does not alter the analysis. Both parties cite cases that analyzed whether a former employee was entitled to a bonus payment after termination. Defendant analogizes to *Landye Bennett Blumstein, LLP v. Jeffrey S. Mutnick, PC*, 270 Or. App. 158, 346 P.3d 1265 (2015). Def. Mot. 8-9. In *Landye*, the Oregon Court of Appeals found that a lawyer was not entitled to a performance bonus after withdrawing from the firm's partnership. 270 Or. App. at 173. The court based its finding on two contract provisions. *See id.* First, the partnership agreement at issue in *Landye* listed the types of payments to which withdrawing partners were entitled. *Id.* Specifically, of the three compensation types available (guaranteed payments, shares in profits and losses, and bonuses), the partnership agreement only provided for withdrawing partners to receive guaranteed payments and shares in profits and losses; it made no mention of bonus payments. *Id.* The court found that this exclusion was "a strong indication of an intention not to award a bonus to a withdrawing partner." *Id.* Second, the partnership agreement stated that bonuses were to be paid "'as determined by Majority Vote of Equity Partners following a recommendation of the Management Committee.'" *Id.* The court read this provision to imply that bonus payments were discretionary. *Id.* "Given the omission of a bonus from the types of compensation paid to withdrawn partners . . . and the discretionary nature of the bonus," the court concluded that "the partnership agreement cannot plausibly be construed to *require* payment of a bonus to a withdrawn partner for performance during the preceding year." *Id.*

The Employment Agreements here do not list the types of compensation paid out upon termination, but they do list situations where bonuses are *not* paid after termination. For example, the Offer Letters state that "all unpaid incentive bonuses shall be forfeited" if an employee resigns or is terminated "for cause." Crabtree Decl. Ex. 1, at 24; Marton Decl. Ex. 1. It does not state that bonuses are forfeited

when an employee is terminated *not* for cause. Like the exclusion in *Landye*, the absence of such language here is informative. Unlike *Landye*, however, the absence here supports a finding that plaintiff's bonuses should have survived his termination. The Employment Agreements also differ from the *Landye* partnership agreement in the degree of discretion afforded to the entity. In *Landye*, the partnership agreement plainly states that the bonuses would be determined by equity partner vote. Here, the Bonus Agreement provides specific qualifying criteria by project and states that bonus allocations are "determined at the Branch Manager's discretion based upon his/her determination of contribution to the project success." Crabtree Decl. Ex. 1, at 29; Marton Decl. Ex. 6, at 3. In *Landye*, the partnership clearly had discretion in deciding whether to award a bonus to a given partner. Here, it is only clear that defendant has discretion in deciding to award a PSI bonus for a given project and in allocating said bonus based on employee contribution.

Plaintiff, on the other hand, points to *Summit RWP, Inc. v. Hallin*, 334 Or. App. 529, 557 P.3d 1113 (2024). In *Summit*, the employee's contract included a two percent quarterly bonus, which the employee had earned before his termination. *Id.* at 533. The *Summit* court found that the employee was entitled to his bonus because he had earned it before termination. *Summit* is of little aid here because the contract terms were not in dispute in that case. Nevertheless, it is a helpful clarification that earned bonuses are not automatically forfeited upon termination.[2] Here, defendant has not shown as a matter of law that it was permitted to withhold plaintiff's PSI bonus upon his termination. Accordingly, defendant's motion is denied as to the breach of contract claim.

**B.    Remaining Claims**

---

[2] Defendant also cites several out of state cases, none of which command a different outcome. For example, in *Tao v. Simplex Invs., LLC*, No. 1-21-1040, 2022 WL 3535991, at *2 (Ill. App. Ct. Aug. 18, 2022), an unpublished opinion, the circuit court found that the employee's offer letter was "'a clear-cut example of a discretionary bonus'" because the letter "'[n]ot only . . . describe[d] itself as a "discretionary bonus plan,"'" it also "'expressly conditioned'" receipt of the bonus on "'excellent performance.'" The circuit court explained that "'[e]valuation on an employee's "performance" is literally the example given by the Illinois Department of Labor [] of an "indefinite or uncertain" term which renders a bonus discretionary, rather than earned'" under Illinois law. *Id.* (cleaned up). The appellate court agreed. *Id.*, at *6. Here, the PSI bonus was not described as a "discretionary bonus plan" and its award was not conditioned upon a given employee's "excellent performance."

The remaining claims at issue in defendant's motion rise and fall with the breach of contract claim and defendant's motion is therefore denied accordingly.

1. *Unpaid Wages*

Defendant argues that the unpaid wages claim must fail because the PSI bonus was discretionary and therefore cannot constitute an earned wage under the statute. Def. Mot. [x] (citing Or. Rev. Stat. § 652.150). Because there is a genuine dispute as to whether the PSI bonus was earned, there is also a genuine dispute of material fact as to the unpaid wages claim. *See Summit*, 334 Or. App. at 539-40 (finding the employee entitled to unpaid wages penalties when he was not paid an earned bonus after termination). Defendant's motion is therefore denied as to the unpaid wages claim.

2. *Duty of Good Faith and Fair Dealing*

Likewise, because the breach of contract claim survives, so too does the good faith and fair dealing claim. Defendant argues that it is entitled to summary judgment on this claim because (1) the Bonus Agreement is not a valid contract, and (2) if the Bonus Agreement is a valid contract, it gave the company complete discretion over awarding PSI bonuses. *See* Def. Mot. 10-11. For the reasons discussed above, the Bonus Agreement is a valid contract, and it is ambiguous as to whether it entitled defendant to complete discretion over awarding PSI bonuses. Defendant's motion is therefore also denied as to this claim.

## CONCLUSION

For the reasons stated herein, defendant's Motion for Partial Summary Judgment, ECF [8], is DENIED.

IT IS SO ORDERED.

DATED this 29th day of September, 2025.

_____
Adrienne Nelson
United States District Judge